UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| LATASHA OLIVARES | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 2:20-CV-113 |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OSCAR MARTINEZ, IN HIS | ) | **JURY TRIAL DEMANDED** |
| INDIVIDUAL AND OFFICIAL | ) | |
| CAPACITY AS LAKE COUNTY | ) | |
| SHERIFF; LAKE COUNTY SHERIFF'S | ) | **ELECTRONICALLY FILED** |
| DEPARTMENT; TERRY WAYNE SMITH | ) | |
| IN HIS INDIVIDUAL CAPACITY | ) | |
| Defendants. | ) | |

**PLAINTIFF'S INITIAL COMPLAINT**

Comes the Plaintiff, Latasha Olivares for her Initial Complaint against Defendants Oscar

Martinez, Lake County Sheriff, Lake County Sheriff's Department, and Terry Smith, former

Lieutenant:

**PARTIES**

1. Plaintiff, is a resident of Galveston County, Texas, is an African American female age

   forty (40), was a Court Deputy ("CD") hired by Lake County Sheriff's Department

   ("LCSD") on January 8, 2018, during the relevant time period and was a permanent

   employee with the LCSD in the Court Division, a division of the Lake County

   Sheriff's Department under the Lake County Government.

2. At all times relevant, Plaintiff's employer, pursuant to Title VII of the Civil Rights

   Act of 1964 (as amended), 42 U.S.C. sec 2000 (et. seq) is the Court Division of the

   Lake County Sheriff's Department, under the Lake County Government, Oscar

   Martinez, Sheriff.

1

3. All of the acts and failures to act alleged herein were duly performed by and attributable to LCSD, and or any entity acting as a successor, agent, alter ego, employee, indirect employer, joint employer, and integrated enterprise and/or under the direction and control of LCSD.  Said acts and failures to act were within the scope of such agency and/or employment, and Defendant participated in, approved and/or ratified the unlawful acts and omissions by other Defendants complained of herein. Whenever and wherever reference is made in this Complaint to any act by a Defendant, such allegations and reference shall also be deemed to mean the acts and failure of LCSD and any other entity acting as a successor, agent, alter ego, employee, indirect employer, joint employer, its integrated enterprise, and/or under the direction and control of LCSD.

**JURISDICTION AND VENUE**

4. This court has original jurisdiction in this action pursuant to 28 U.S.C. Sections 1331 and 1343 and 42 U.S.C. Section 2000e-5, inasmuch as the matter in controversy is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et. seq.

5. Venue is properly fixed in this Division and District as the race, sex and retaliation violations of Title VII of the Civil Rights Act of 1964 occurred in Lake County, Indiana.

6. The jurisdiction of this Court is invoked to secure protection and redress deprivation of rights guaranteed by federal law, which rights provide for injunctive relief and other relief for illegal employment discrimination.  The amount in controversy in this action meets the jurisdictional limits of this Court.

7. Plaintiff has complied with all conditions precedent to the filing of this claim required by 42 U.S.C. Section 2000e(5) namely: a charge of discrimination was filed with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the unlawful employment practice; the EEOC issued its findings and provided Plaintiff her "Notice of Right to Sue" letter on December 19, 2019, Plaintiff received said letter on or about December 24, 2019, and this action was commenced within 90 days of the EEOC's findings and receipt of said letter.

**FACTS GIVING RISE TO RELIEF**

8. Prior to her position as a Court Deputy ("Herein "CD"), Plaintiff had four (4) years of law enforcement experience.

9. Plaintiff began her tenure as a CD with the Court Division on January 8, 2018 as the only female African American officer in the division.  To Plaintiff's knowledge, there have been no African American female CD's hired since Plaintiff's termination.

10. Plaintiff was isolated from the beginning as none of her co-workers would speak to her.

11. During Plaintiff's employment she was the subject of constant rumors of inappropriate sexual activity with her co-workers, including her supervisor Lt. Terry Smith (Lt. Smith), which directly impacted her ability to obtain transfers and frequently led to her being removed from her court assignments.

12. These allegations severely damaged Plaintiff's reputation with her co-workers and superiors.

13. Beginning in February of 2018, Plaintiff was informed of a slanderous rumor that had been started by her supervisor Lt. Smith that she had an inappropriate sexual relationship with him.

14. The rumors extended beyond Plaintiff's workplace to the patrons of the courthouse as Plaintiff was accused of having a sexual relationship with Lt. Smith by probationers.

15. Plaintiff was also continuously the subject of scurrilous rumors that she was engaging in frequent, multiple, inappropriate sexual relationships with her superiors.

16. Lt. Smith was frequently the initiator of said slanderous rumors.

17. As Lt. Smith was Plaintiff's superior, said rumors were accepted as true by many of Plaintiff's coworkers and superiors.

18. The rumors of an inappropriate relationship between Plaintiff and Lt. Smith often caused resentment and rifts in Plaintiff's working relationships with coworkers.

19. On March 5, 2018, Plaintiff was approached by CD Spiro who stated, "We all know you're Lt. Smith's 'girl' and that he's trying to give you that sergeant position and I've been here longer than you have and I keep getting overlooked" inferring that Plaintiff was receiving favoritism due to an inappropriate relationship with Lt. Smith.

20. On March 26, 2018, Plaintiff was informed by a coworker that Lt. Smith told several coworkers that he was sleeping with Plaintiff is Oscar Martinez's campaign office.

21. On May 11, 2018, to remove herself from the situation, Plaintiff reached out to Deputy Warden Cox about transferring to the jail and was given an application.

22. From May 15, through May 18, 2018 Sgt. Foster informed Plaintiff during training that she was "the only Queen Bitch in court security, for some reason females just don't last" and suggested that Plaintiff start looking elsewhere for employment.

23. On May 18, 2018, Lt. Smith engaged in an inappropriate conversation regarding male and female genitalia in the presence of Plaintiff. Lt. Smith then proceeded to ask P. Moton, a male coworker of Plaintiff's if he thought he could "afford a woman" like Plaintiff. P. Moton responded by pulling out money and flashing it. Lt. Smith then stated, "No that's not enough, Plaintiff is the big money type." Lt. Smith then accused Plaintiff of having an inappropriate sexual relationship with another coworker to which Plaintiff responded that she is married and is tired of being accused by Lt. Smith of sleeping with everyone.

24. On multiple occasions Lt. Smith would state in the presence of Plaintiff and other coworkers that his "Lake County checks were pussy money" used for his conquests with women.

25. The rumors, comments, and innuendos became progressively worse, and Plaintiff repeatedly rebuffed Lt. Smith's advances and comments, and denied Lt. Smith's claims whenever possible, but feared retaliation if she complained about her superior.

26. On multiple occasions Lt. Smith made threats to court personnel and Plaintiff's coworkers that they were not to speak to Plaintiff because she was "his woman."

27. As a result, multiple coworkers and various court personnel were afraid to speak to Plaintiff for fear of retaliation by Lt. Smith.

28. Lt. Smith threatened Plaintiff on multiple occasions that he would "Go to Oscar" and have her terminated if she didn't do as he demanded.

29. Numerous Court Deputies and court personnel were aware of Lt. Smith's comments, rumors, and innuendos but all expressed that they were afraid to speak up for fear of retaliation.

30. As Plaintiff continued to rebuff Lt. Smith's advances, the more pervasive, hostile, toxic and retaliatory Plaintiff's work environment became.

31. As Lt. Smith's comments and inappropriate remarks and sexual harassment continued to worsen, Plaintiff began to socially distance herself for fear of furthering the rumors.

32. On May 23, 2018, at approximately 7:00 am as Plaintiff was entering the Court Division office, Lt. Smith approached Plaintiff and stated, "What's wrong with you, are you and your husband okay? Because you don't speak no more.  I'm just wondering because you've been walking around here with this bad fucked up attitude like someone has done something to your ass.  I don't see how a motherfucker got the audacity not to speak after you have made they ass.  I'm the reason why you're here and that man right there on the wall (referencing Sheriff Oscar Martinez).  So, if you have a problem doing your job all I got to do is tell Oscar I'm done with your ass and there won't be any questions after that, now you understand me?"

33. On May 23, 2018, at approximately 11:00am, Lt. Smith made good on his earlier threat and stated to Plaintiff, "Get dressed and report to Gary because you are no longer assigned to Crown Point until you learn to get your shit together and realize who runs shit around here.  Now that ought to give you some time to work on that attitude if I decide to bring you back."

34. In addition to the constant sexual harassment, sex discrimination, and hostile work environment, Lt. Smith placed Plaintiff in dangerous situations that jeopardized her safety, inmate safety and violated LCSD protocol.

35. On June 20, 2018, Lt. Smith ordered Plaintiff to transport an inmate from Gary to the Lake County Jail with no restraints or a proper transport vehicle with caging. Lt. Smith further instructed Plaintiff to stay off radio communications during the transport.

36. After Plaintiff processed the inmate and returned to the court security office, Lt. Smith approached Plaintiff and stated, "You're lucky I'm not writing your motherfucking ass up." Lt. Smith then further intimidated Plaintiff by getting into her face and stating, "Your ass is hard headed and you need to do what the fuck I tell you to because I make the decisions if your ass stays or not."

37. L. Clemons, court personnel, witnessed the incident and informed Plaintiff per protocol, she was not supposed to transport the inmate alone. L. Clemons further informed Plaintiff that Lt. Smith had received instructions per Chief Patterson that two patrol officers were sent to handle the inmate and Lt. Smith's response was "We're court security and we handle our own shit."

38. On July 1, 2018, Lt. Smith completed a performance evaluation claiming Plaintiff did not follow the chain of command, had a bad attitude, and did not get along with others. Lt. Smith recommended Plaintiff be transferred or put on 90-day probation to correct behavior. The evaluation was not brought to Plaintiff's attention until the termination of employment.

39. Lt. Smith frequently requested that Plaintiff accompany him to "Nap" (Indianapolis), and take rides in his Range Rover, to which Plaintiff always declined.

40. In addition to the rumors, Lt. Smith routinely made inappropriate comments to and about Plaintiff regarding her anatomy and made comments to court personnel about sexual acts he'd like to perform on Plaintiff.

41. On one occasion in July 2018, Lt. Smith stated to L. Clemons (court personnel) that he would "Take Plaintiff to 'Nap' (Indianapolis) and eat her dry."  Mr. Clemons promptly informed Plaintiff of the comment.

42. Plaintiff was not the only female to experience sexual harassment by Lt. Smith.  A prior court deputy was also harassed and the victim of various rumors of inappropriate sexual relationships with Lt. Smith.  Upon continuously rebuffing Lt. Smith's advances, she was terminated.

43. On July 15, 2018, Plaintiff's uncle passed away.  Plaintiff requested bereavement time as outlined in the Lake County Policy Handbook on page 52.  Lt. Smith denied her request.

44. On July 15, 2018, on the same day Plaintiff later was informed that her brother was involved in a severe car accident.  Plaintiff again requested time off to process.

45. On July 16, 2018, when Plaintiff reported for her shift, she requested to speak with Lt. Smith.  Lt. Smith initially ignored Plaintiff's request.  When Plaintiff asked again Lt. Smith responded, "Whatever the fuck you have to tell me just text that shit to my phone."

46. Plaintiff then requested her coworker and the probationer to step out but kept the door open as she proceeded to inform Lt. Smith of her uncle's passing and her brother's condition on life support.  Plaintiff then requested time off to which Lt. Smith responded, "That's all you had to tell me?  Hell, you could have text that shit to my

phone.  Like I told your ass earlier, people die every day and I still bring my ass to work and I haven't called off one day since I've been here so what do you want me to do?"

47. Distraught, Plaintiff began to walk away when Lt. Smith yelled for her to return to the office and demanded that she complete an additional task.

48. Plaintiff traveled to visit her family on her own personal time over the weekend and returned in time to report to her shift on that following Monday.

49. On July 23, 2018, Plaintiff's brother was removed from life support and passed away. The next day Plaintiff again made Lt. Smith aware of the situation and provided him with the date of the funeral service (July 28, 2018) and requested July 27, 2018 off to travel to Texas for the services.  Lt. Smith declined Plaintiff's request stating a "lack of manpower" and informed her she would have to schedule her flight after her shift.

50. When Plaintiff demanded to speak with her chain of command Lt. Smith threatened Plaintiff stating "Now you see what happened to Spiro motherfucking ass for going over my head, his ass is about to be out of here and you can follow him because what you fail to realize is that you don't run shit around here and your only job is to do what the fuck I tell you to do, now is that clear?"

51. In the afternoon on July 27, 2018, Plaintiff was informed by Lt. Smith that due to seniority there was a schedule change and she would have to work on July 28, 2018, the date of her brother's funeral.

52. As a result of said last minute change, Plaintiff could not attend her brother's funeral.

53. During the week of July 22, 2018, through July 28, 2018, Plaintiff and fellow court security deputy P. Moton were assigned to work overtime to provide courthouse

security during a trial.  Plaintiff nor her coworker were paid for their overtime hours worked.

54. On August 20, 2018, Plaintiff was given a verbal reprimand for tardiness by Lt. Smith.  Plaintiff was at work on time on the day in question.  Plaintiff had arrived on time and requested permission to return to her vehicle to retrieve an item she had left. Plaintiff was granted permission, but upon her immediate return Lt. Smith recorded that she was tardy.

55. On August 21, 2018, Plaintiff received a written reprimand from Lt. Smith for neglect of duties for leaving sensitive information open on a computer.  The computer was signed into with Lt. Smith's password which Plaintiff had no access to.  Additionally, one Sgt. Sesson, who was the last to leave, informed Plaintiff that the computers were not on when he left and locked the office.

56. On August 23, 2018 Lt. Smith sent the court deputies their work schedules and intentionally left Plaintiff off the message.  A coworker informed Plaintiff of her assigned schedule but stated in the message "You didn't get this from me," evidencing the environment of fear and retaliation Lt. Smith that existed.

57. Plaintiff reported to work timely despite Lt. Smith's efforts to impede Plaintiff's ability to report to duty on time.

58. On August 23, 2018, after Plaintiff was reprimanded erroneously for tardiness on August 20, 2018, Lt. Smith informed Deputy John S., a white male officer, that he did not have to report at his scheduled time of 7:30 am after Deputy John S. stated that he had "just woken up and would get there when he could."  Deputy John S. report time

was changed to 8:30 am.  Deputy John S. arrived after his scheduled time of 8:30 am but wrote a sign in time of 8:15 am.  He was not reprimanded.

59. On September 18, 2018, upon arriving on duty, Plaintiff informed Deputy Spiro that her taser had been malfunctioning for months. Spiro advised that it may need new batteries or resetting and asked if Plaintiff had advised Lt. Smith of the issue. Plaintiff informed Spiro that she had, but Lt. Smith had refused to rectify the issue.

60. On September 18, 2018 as Plaintiff returned from her lunch break Spiro stated, "Just let me give you a quick heads up, and you did not get this from me.  I was told to check and see if you were wearing your taser because the first time you report for duty without it, Lt. Smith is sending your ass home and writing you up for reporting to work out of uniform."

61. Plaintiff had advised Lt. Smith via text message that her taser was malfunctioning and she needed to bring it to him to be repaired.  Lt. Smith responded and stated, "Keep your taser until the taser class. The instructor/repairer will handle it then, there are no replacements at this time."

62. On September 19, 2018, Lt. Smith texted Plaintiff and asked, "Are you wearing that taser today?" to which Plaintiff replied, "Yes sir."

63. On September 19, 2018, Lt. Smith called Plaintiff on her personal cell phone and stated for Plaintiff to "Lock up her taser at her home in her gun safe until the taser recertification class in October."

64. On September 19, 2018, confused by the conflicting instructions, Plaintiff emailed Commander Eaton the text message conversation between she and Lt. Smith along with the information she received via phone call.

65. On September 20, 2018, Deputy Nettles text messaged Plaintiff the phone number for Sgt. Poe, taser instructor, to inspect her taser.

66. On September 21, 2018, Deputy Nettles informed Plaintiff that Sgt. Poe tested her taser and the battery was dead, but Sgt. Poe had replaced the battery and it was working.

67. On September 21, 2018, Plaintiff retrieved her repaired taser from Sgt. Poe.  Plaintiff continued to carry it on her person.

68. On September 28, 2018, Lt. Smith wrote up a verbal reprimanded with a recorded date of October 3, 2018.  Plaintiff was reprimanded for challenging the authority of her supervisor by not following her supervisor's instructions to lock up her taser until taser training.  Plaintiff was presented with the verbal reprimand by Sgt. Foster on October 9, 2018.

69. On October 9, 2018, Plaintiff arrived to work around 7:30 am and signed in. Plaintiff's shift began at 9:00 am, but plaintiff often arrived early to purchase breakfast from the café.

70. On October 9, 2018, Sgt. Foster commented that Plaintiff was early then later scribbled out Plaintiff's sign in and sign out entry.  Sgt. Foster then erroneously reported Plaintiff as tardy.

71. Sgt. Foster questioned Plaintiff regarding there being an inappropriate sexual relationship between Lt. Smith and Plaintiff.  Plaintiff replied "No" and informed Sgt. Foster that she was married to which Sgt. Foster replied, "That don't mean shit."

72. On October 9, 2018, Plaintiff was informed by a court employee that Sgt. Foster and Lt. Smith were trying to get rid of her and that Sgt. Foster had been speaking ill of Plaintiff around everyone.

73. On October 9, 2018, Plaintiff was informed by a separate court employee that Sgt. Foster had discussed Plaintiff and stated that "She uses what is between her legs to get what she wants, that's how she got here."  Sgt. Foster continued and stated that Plaintiff had slept with Lt. Smith and Commander Eaton.  Sgt. Foster then allowed the court employee to read Plaintiff's reprimand.  Said court employee took a picture of the reprimand and provided it to Plaintiff as Sgt. Foster had refused to provide Plaintiff a copy.

74. Sgt. Foster continued the rumors and false accusations by stating that Plaintiff's taser was removed from Plaintiff because she was "using it on her on her husband" and "beats his ass."

75. On October 10, 2018, Plaintiff received yet another reprimand from Lt. Smith and when Plaintiff refused to sign Lt. Smith stated, "You need to start looking for another job you're not a good fit here." And, "If I knew your motherfucking ass wasn't fucking, I would have never hired your ass!"

76. On October 10, 2018, Plaintiff met with Commander Eaton and advised him of the statement Lt. Smith made and expressed concern over the disparate treatment she had received.

77. On October 15, 2018, Sgt. McLoughlin informed Plaintiff that Lt. Smith stated that Plaintiff was not to "call or fucking text Lt. Smith's phone not even for training" and that she was to report directly to Sgt. McLoughlin.

78. On October 17, 2018, Plaintiff was interviewed for three (3) hours by Internal Affairs investigators Corporal L. Thurmond and Commander Stewart.  Plaintiff was never informed if the result of the investigation was substantiated or unsubstantiated.

79. On October 31, 2018, Plaintiff contacted Human Resources and requested a complaint form.  Plaintiff was never provided a form.

80. On November 5, 2018, Sgt. McLoughlin advised Plaintiff that Lt. Smith informed him that Plaintiff could no longer wear her Lake County Sherriff's Office sweatshirt and had to wear a Lake County Sheriff's Office zip up hooded sweatshirt or a Lake County Sheriff's Office jacket.  Lt. Smith had also informed Sgt. McLoughlin to watch for Plaintiff's portable heater.  Several deputies and sergeants also had portable heaters due to weather conditions.

81. The sweatshirt in question was issued by Lt. Smith once deputies purchased them.

82. On November 6, 2018, Sgt. McLoughlin informed Plaintiff Sgt. Foster was in route to provide Plaintiff transfer documents.  Instead, Plaintiff was presented with a reprimand along with three (3) photos taken by Lt. Smith on November 3, 2018 pertaining to Plaintiff's sweatshirt and cell phone usage.  Plaintiff was outside on her break during her cellphone usage.

83. Male deputies Nettles and Gavin had also worn their Lake County Sheriff's Office sweatshirts.  To Plaintiff's knowledge they were not reprimanded.

84. On November 6, 2018, Lt. Smith and Deputy P. Moton approached Plaintiff.  Lt. Smith proceeded to ask Plaintiff what was going on with her and why was she so mean and not speaking to anyone.  He then informed Plaintiff that he wanted her to go back to the "old her" he first hired.  He then stated, "Anything that I ask you to do

you can definitely get your job done no questions asked, but until you learn there is only one person running this department and until you realize it is my decision to determine whether you stay or not, because you could have been gone a long time ago."

85. Lt. Smith then proceeded to ask Plaintiff what location she would like to be assigned, to leverage his authority.  Plaintiff replied that it did not matter to her and informed Lt. Smith that he and Plaintiff could not be in the same building.  Plaintiff then requested a copy of her reprimand.  Her request was denied.

86. On November 26, 2018, Plaintiff observed Lt. Smith in a Lake County Court Security vehicle in her apartment complex.

87. Lt. Smith would frequently remove the personnel files of LCSD court deputies and take them home.  These documents contained personal information such as social security numbers and addresses.

88. Plaintiff was informed by former Court Security Deputy L. Janigan that when she declined Lt. Smith's sexual advances and misconduct, she began to receive baseless reprimands and harassment from Lt. Smith and Sgt. Foster.  After Ms. Janigan was terminated, Lt. Smith obtained her home address from her personnel file and subsequently traveled to her home without advanced notice or an invitation.

89. On November 30, 2018, Lt. Smith was terminated from his position at Lake County Sheriff's Department, Court Security Division.

90. Despite Lt. Smith's termination, Plaintiff continued to be the subject scurrilous rumors, unfair and disparate treatment, discrimination, retaliation and ostracism in her workplace.

91. On February 27, 2019, Deputy. D. Gray stated to Plaintiff, "What's wrong with you people? Always trying to sneak upstairs. They don't want you type of people upstairs" referring to Plaintiff's ethnicity.

92. On April 2, 2019, Plaintiff was assigned as a floater to relieve court deputies for their breaks. Plaintiff arrived on time to relieve Deputy P. Moton for his fifteen (15) minute break. When Deputy P. Moton did not return on time Plaintiff attempted to call out to him to return, as he was within Plaintiff's purview. He ignored her. When Plaintiff stepped away from the post to ask P. Moton, who was conversing with others, to return she was reprimanded by Sgt. Kouder for violation of a direct order and abandoning her post. Although it was Deputy Moton's post, he was not reprimanded.

93. On April 4, 2019, while recently off-duty and still dressed in her uniform, Plaintiff went to Meijers, located on 611 W. Lincoln Highway in Merrillville, Indiana when she encountered her fellow court deputy, L. Lemus still in his LCSD uniform as well. Deputy Lemus threatened to slash Plaintiff's throat by making the "cutting throat" gesture at Plaintiff, who was with her son at the time. Plaintiff reported the incident the following day and the incident was even confirmed by Deputy Lemus himself who informed Sgt. Foster of his actions. Plaintiff has no knowledge of any actions taken regarding his conduct.

94. Plaintiff, who had over four (4) years fingerprinting experience, requested on numerous occasions to be transferred to the Civil Division for the open fingerprint position. On April 12, 2019, Plaintiff was informed by Officer M. Harvey that newly hired Deputy B. Tomniko, a white male, whose father and brother also were

employed by LCSD in the Patrol Division, would start training for the position on April 15, 2019.

95. On June 7, 2019, Plaintiff requested to speak with A. Higgs, Maintenance Supervisor, regarding ongoing issues she was experiencing with Tim, a court maintenance employee. Tim was spreading rumors about Plaintiff and advising the male employees to "stay from Plaintiff because she is trouble and likes to record conversations men." Tim also stated that "Plaintiff is the reason Lt. Smith was fired because she was sleeping with him at Oscar Martinez's campaign office." Plaintiff also complained about this individual to her chain of command.

96. On June 14, 2019, Plaintiff arrived early for her shift, as was her customary practice. When her shift began, she reported to her post. However, her post was fully occupied by other deputies leaving her nowhere to sit. Plaintiff reported this to her chain of command, Sgt. Kouder, while continuing to stand at her post. Plaintiff never left the purview of her post, yet she received a written reprimand on June 24, 2019, for insubordination and making a false official report. Unbeknownst to Plaintiff, with this unsubstantiated reprimand, Sgt. Kouder recommended Plaintiff for termination.

97. On July 2, 2019, Plaintiff received a text message from Sgt. Kouder that stated, "Yesterday's report was clear and concise and factual. Contraband was properly packaged for chain of custody. Good job."

98. On July 3, 2019, Plaintiff received a message from Sgt. Kouder informing Plaintiff to report to the chief's office at 2:00 pm.

99. When Plaintiff reported to the chief's office, she was informed that she "wasn't a good fit" for the department. The decision, Plaintiff was told, was made based upon

the reprimands she received, including those previously received from Lt. Smith,
though retaliatory.  Plaintiff was never provided the opportunity to present
information that proved she had been erroneously reprimanded.

100.    Since Plaintiff's termination, she has been unable to secure employment within
the law enforcement sector.

101.    During Plaintiff's interview process, she was informed that her potential employer
had received a packet of information from LCSD alleging Plaintiff was "racist against
white people" and full of complaints and comments that Plaintiff had not been made
aware of during her employment with LCSD Court Security Division.  As a result,
Plaintiff was not offered employment with the potential employer.

102.    Plaintiff has been rejected from over one hundred (100) potential employers since
her termination from LCSD.

**COUNT I**
**SEXUAL HARASSMENT**

103.    Plaintiff incorporates as if fully restated all the allegations previously written.

104.    Plaintiff was subjected to unwelcome, offensive and harassing sexually
discriminatory conduct during her employment with Defendant LCSD which was
perpetrated upon her by coworkers., and her superiors, Lt. Smith and Sgt. Foster and
that this conduct was based upon and directed at Plaintiff by reason of her gender.

105.    Plaintiff was threatened and intimidated from reporting the sexually
discriminatory conduct.  Plaintiff's fellow coworkers also noticed the sexually
discriminatory conduct but were also intimidated by the prospect of losing their
employment.

18

106. When Plaintiff dared have the courage to report the above-mentioned behavior, she was met with retaliation, further discrimination, ostracism, and isolation.

107. This sexually harassing and discriminatory conduct was sufficiently severe and pervasive so as to unreasonably interfere with Plaintiff's physical health, work performance and so as to create an intimidating, hostile and offensive working environment.

108. Defendants fostered a work environment so pervasive and hostile that Plaintiff was often left with no effective channels of recourse.

109. During the times referenced herein, Plaintiff was the subject of multiple false rumors of having sexual relationships with co-workers, of engaging in sexual acts for her superiors, and was openly questioned about parts of her body by Lt. Smith and her sexual relationships by Sgt. Foster in front of other co-workers. No corrective action was taken against Lt. Smith or Sgt. Foster for such conduct.

110. Said multiple comments and harassment ruined the reputation and credibility of Plaintiff, the only African American female deputy in the entire Court Security Division and created an atmosphere of hostility which severely damaged the reputation in the eyes of her coworkers and superiors.

111. Plaintiff was a victim of retaliatory conduct on the part of Defendants.

112. Moreover, this conduct was ongoing and pervasive and constituted a "continuing violation" of Plaintiff's right. During the course of her employment, Plaintiff was forced to work in a sexually discriminatory and hostile environment. LCSD Court Division's command was put on notice of the sexually suggestive nature of its

employee, Lt. Smith., and failed to take immediate corrective action, all to Plaintiff's detriment.

113.    Plaintiff continued to experience retaliation and received reprimands at the direction of Lt. Smith after she complained of his sexually discriminatory behavior and sexual harassment.

114.    LCSD Court Division's command was aware of the hostile work environment acquiesced in the environment.  Plaintiff was not the first to experience Lt. Smith's sexual harassment and unwanted sexual advances.  The Court Division, court employees, and court patrons were all on notice of Lt. Smith's behaviors.  No official action was taken to change the atmosphere of LCSD.

115.    Lt. Smith's actions were open and obvious to other employees, both superiors and subordinates at LCSD.

116.    Plaintiff was subject to both hostile work environment and quid pro quo sexual harassment.

117.    As a direct and proximate result of the harassing and hostile sexual environment inflicted by her superiors Lt. Smith and Sgt. Foster, as well as her coworkers in the Court Division, Plaintiff suffered great embarrassment, humiliation and mental and physical anguish.

**COUNT II**
**SEX DISCRIMINATION**

118.    Plaintiff incorporates as if fully restated all of the allegations previously written.

119.    During the course of Plaintiff's employment with Defendants, the Defendants, by and through its agents and employees, discriminated against the Plaintiff in the terms, conditions, and privileges of employment in various ways, in substantial part because

of her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et. Seq.

120.    The above-described unwelcome sex discrimination created an intimidating, oppressive, hostile, and offensive work environment which interfered with Plaintiff's emotional and physical well-being.

121.    Plaintiff was treated disparately than persons similarly situated with her who were male, and such disparate treatment created an intimidating, oppressive, hostile and offensive work environment which interfered with Plaintiff's emotional and physical well-being.

122.    As a result of the hostile and offensive work environment perpetrated by Defendant's agents Lt. Smith, Sgt. Foster and its employees, and maintained by the Defendant LCSD, and LCSD's failure to protect Plaintiff from such discrimination, the Plaintiff suffered humiliation, emotional distress, and physical pain.

123.    Defendant LCSD through its agents or supervisors failed to adequately supervise, control, discipline, and/or otherwise penalize the conduct, acts, and failures to act of Lt. Smith, Sgt. Foster and its employees as described above.

124.    Defendant LCSD failed to take all reasonable and necessary steps to eliminate sex discrimination from the workplace and to prevent it from occurring in the future

125.    As a further direct and proximate result of Defendant's violation of Title VII of the Civil Rights Act of 1964 as described, Plaintiff has been compelled to retain the services of counsel in an effort to seek relief for the conditions of the employment relationship Plaintiff was subjected to with LCSD and has thereby incurred and will

continue to incur legal fees and costs, the full nature and extent of which are presently

unknown to Plaintiff.

## COUNT III
## SEX DISCRIMINATION

126.    Plaintiff incorporates as if fully restated all of the allegations previously written.

127.    By agreeing to recommend for transfer or promotion and thereby transferring and

giving a position to a male employee over a female employee who met or exceeded

requirements, and who possessed equal or greater job experience than those

recommended for promotion or transfer, the Defendants violated the Civil Rights

Act(as amended), 42. U.S.C. 2000 (et. seq).

128.    By erroneously reprimanding Plaintiff for actions that her male coworkers had

taken and not reprimanding said similarly situated male coworkers, the Defendants

violated the Civil Rights Act (as amended), 42 U.S.C. 2000 (et. seq).

## COUNT IV
## RACE DISCRIMINATION

129.    Plaintiff incorporates as if fully restated all of the allegations previously written.

130.    By agreeing to recommend for transfer or promotion and thereby transferring and

giving a position to a white male employee over an African American female

employee who met or exceeded requirements, and who possessed equal or greater job

experience than those recommended for promotion or transfer, the Defendants

violated the Civil Rights Act(as amended), 42. U.S.C. 2000 (et. seq).

## COUNT V
## RETALIATION

131.    Plaintiff incorporates as if fully restated all of the allegations previously written.

132.    As herein alleged, the Defendants, by and through its officers, agents and/or its

supervisors, illegally retaliated against Plaintiff by unjustly subjecting her to unjust

scrutiny, baseless reprimands, false allegations of misconduct and unwelcome and

derisive comments solely because she had reported the aforementioned sex

discrimination and sexual harassment.  Defendants had no legitimate reasons for any

such acts.  Each said act of retaliation is in violation of Title VII of the Civil Rights

Act of 1964.

133.    Plaintiff is informed and believes, and based thereon alleges, that in addition to

the practices enumerated above, the Defendants may have engaged in other

discriminatory practices against her which are not yet fully known.  At such time as

such discriminatory practices become known, Plaintiff will seek leave of Court to

amend this Complaint in that regard.

134.    As a direct and proximate result of the Defendant's willful, knowing, and

intentional discrimination and retaliation against Plaintiff, Plaintiff has suffered and

will continue to suffer pain, humiliation and emotional distress.  Plaintiff has suffered

and will continue to suffer a loss of earnings and other employment benefits and job

opportunities.  Plaintiff is thereby entitled to general and compensatory damages in

amounts to be proven at trial.

135.    As a further direct and proximate result of Defendant's violation of Title VII of

the Civil Rights Act of 1964, as described, Plaintiff has been compelled to retain the

services of counsel in an effort to seek relief for the conditions of the employment

relationship Plaintiff was subjected to with LCSD and has thereby incurred and will

continue to incur legal fees and costs, the full nature and extent of which are presently unknown to Plaintiff.

136.    Plaintiff is informed and believes, and based thereon alleges, that the Defendant's conduct as described above was willful, wanton, malicious, and done in reckless disregard for the safety and well-being of Plaintiff.  By reason thereof, Plaintiff is entitled to punitive or exemplary damages from the Defendants in a sum according to proof at trial.

**COUNT VI**
**RETALIATION**

137.    Plaintiff incorporates as if fully restated all of the allegations previously written.

138.    On July 3, 2019, was contacted and told to report to the chief's office at 2:00 pm.

139.    When Plaintiff arrived, she was informed that was not a "good fit" and was being terminated.  Plaintiff was informed that the decision was based upon the reprimands she had received, including those received from Lt. Smith.

140.    Plaintiff had cooperated with an internal affairs investigation several months prior and provided information proving the reprimands she received from Lt. Smith were groundless.

141.    During the time after Plaintiff rebuffed sexual advances and reported sexual harassment, Plaintiff was regularly singled out and reprimanded for actions that she did not take or were the same as her male counterparts, in Defendants effort to terminate her in violation of Title VII of The Civil Rights Act of 1964, as amended.

142.    Plaintiff continued to experience and receive retaliatory actions due to exercising her rights to report Lt. Smith, even after Lt. Smith was no longer employed by LCSD. This is evidenced by comments continuously made by Plaintiff's superiors that she

24

had engaged in a sexual relationship with Lt. Smith, and as such was responsible for his termination.

143.    The additional reprimands Plaintiff received were also unsubstantiated and given as a pretext for retaliation, discrimination and unlawful termination.

144.    The acts and omissions of Defendant LCSD were outrageous, wanton, intentional, reckless and in deliberate disregard of Plaintiff's established rights.

## COUNT VII
## RETALIATION

145.    Plaintiff incorporates as if fully restated all of the allegations previously written.

146.    On February 20, 2020, Plaintiff was informed by a potential employer that they had received unsolicited documentation totaling over forty pages, alleging and describing false claims pertaining to Plaintiff's employment with LCSD.

147.    Per LCSD's policy handbook (pg. 27), previous employment is only to be verified according to start and end date and pay rate.  No detailed information is to be provided.

148.    Defendant LCSD has further retaliated against Plaintiff beyond her employment and has further impeded her in an attempt to blacklist Plaintiff in the law enforcement industry.  By reason thereof, Plaintiff is entitled to punitive or exemplary damages from the Defendants in a sum according to proof at trial.

**WHEREFORE**, Plaintiff, Latasha Olivares, demands judgment against the Defendants, in an amount which will compensate her for:

1. Violation of her rights under Title VII of the Civil Rights Act of 1964;

2. Compensatory damages including lost wages, past and future and/or

impairment of power to earn money; physical pain, emotional distress and

humiliation, past and future; and past and future medical expenses;

3. Punitive damages to punish the Defendant for its willful, wanton, oppressive,

malicious, and/or grossly negligent conduct;

4. A permanent injunction precluding Defendants from providing defamatory

information to Plaintiff's potential employers, blacklisting or preventing Plaintiff

from receiving work within the law enforcement industry;

5. Trial by jury on all issues so triable;

6. Costs expended herein, including reasonable attorneys' fees;

7. Pre-judgment and post-judgment interest; and

8. Any and all other relief to which she may be entitled.

Respectfully submitted,

**/s/ Crystal D. Martin**
CRYSTAL D. MARTIN (# 31414-64)
CRYSTAL D. MARTIN, ATTORNEY AT LAW
13229 S. 48th St. #2048
Phoenix, Arizona 85044

(219) 237-9343
attycdmartin@gmail.com

*COUNSEL FOR PLAINTIFF*

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of March, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, and that service of a true and complete copy was made upon each party by U.S. Certified Mail.

/s/ Crystal D. Martin
Crystal D. Martin

26